UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

```
JIMMY REED,                   )
                              )
            Plaintiff         )
                              )
      v.                      )  Case No. 2:04 cv 212
                              )
JO ANNE B. BARNHART,          )
Commissioner of Social Security )
                              )
            Defendant         )
```

OPINION AND ORDER

This matter is before the court on the Motion for Summary
Judgment filed by the plaintiff, Jimmy Reed, on October 12, 2004.
For the reasons set forth below, the motion is **GRANTED**.

Background

**Procedural History**

The plaintiff, Jimmy Reed, initially applied for Disability
Insurance Benefits ("DIB") on July 12, 1988, alleging a disabil-
ity onset date of February 18, 1988. (Tr. 33) Following denials
of benefits initially and upon reconsideration, Reed requested a
hearing before an administrative law judge ("ALJ") on November
20, 1989, and a hearing was held before ALJ Richard Ver Wiebe on
May 16, 1990.  (Tr. 29) Following the hearing, ALJ Ver Wiebe
determined that Reed was entitled to DIB and a period of disabi-
lity commencing February 18, 1988, in a written decision dated
August 28, 1990.

Pursuant to a continuing disability review, on September 26,
1994, the Social Security Administration ("SSA") determined that

Reed no longer was disabled as of October 1, 1994, and terminated his DIB payments as of December 1, 1994. (Tr. 76); *see* 20 C.F.R. ß404.1590. Reed requested a reconsideration of the Commissioner's decision on October 4, 1994, and the SSA confirmed its decision on February 2, 1995. (Tr. 54, 66) On February 9, 1995, Reed requested an ALJ hearing, and a hearing was held before ALJ Dennis R. Kramer on May 2, 1997. (Tr. 38, 544-615) Subsequent to the hearing in which Reed, psychologist Joseph Cools, orthopedic surgeon William Newman, and Vocational Expert ("VE") Cheryl Hoseith testified, ALJ Kramer denied Reed's request for reconsideration by written decision dated June 14, 1997. (Tr. 217-24, 545) Following a request for review on June 23, 1997, the Appeals Council vacated ALJ Kramer's decision and remanded the case for a new hearing on November 12, 1999. (Tr. 340-42)

On February 18, 2000, ALJ William Wilkin conducted a hearing in which Reed and VE Irvin Roth testified. (Tr. 616-88) ALJ Wilkin held a second hearing on June 26, 2000 to clarify issues raised in the February 18 hearing. (Tr. 689-716) After the second hearing in which Reed and his fiancee Loretta Ficker testified, ALJ Wilkin affirmed the Commissioner's determination that Reed no longer was disabled by written decision dated August 22, 2000. (Tr. 11-24) Following a denial of his request for review by the Appeals Council on January 17, 2001, Reed filed a complaint in this court on May 25, 2004. (Tr. 7) Because the SSA determined that Reed was not disabled as of October 1, 1994, the court now must determine whether ALJ Wilkin erred in finding Reed

2

not disabled as of that date.  *See* 42 U.S.C. ß423(f); AR 92-2(6),
1992 WL 425419, at *2; ***Johnson v. Apfel***, 191 F.3d 770, 774 (7th
Cir. 1999).

### Evidentiary Record

Reed was born in Toledo, Ohio on July 26, 1949, and was 45
years old when the Commissioner determined that he no longer was
disabled.  (Tr. 548, 622) He was divorced with three children at
the time of the 1997 ALJ hearing, but he subsequently has married
Loretta Ficker.  (Tr. 549, 701) He has a high school education
and some vocational training in welding and heavy equipment,
which he received during the 12 years he served in the army.
(Tr. 624-25) Prior to becoming disabled, Reed worked as a laborer
and then truck driver for Inland Steel.  He injured his back on
February 18, 1988, when his truck was involved in an accident.
(Tr. 117, 314)

The only evidence in the record pre-dating ALJ Ver Wiebe's
August 28, 1990 decision that Reed was disabled is a few physi-
cian's notes from the Veterans' Administration.  (Tr. 99-117) On
June 14, 1988, Dr. B. Pollach diagnosed Reed with a lumbosacral
sprain or strain after Reed complained of constant and occasion-
ally sharp pain, numbness, and tingling radiating through his
left leg which was aggravated by prolonged sitting, standing, or
walking.  (Tr. 117) Dr. Pollach ordered physical therapy, as well
as an EMG and CT scan of Reed's lower left extremity.  (Tr. 117-
18) A therapy note from June 20, 1988 stated that Reed had marked
tightness in his lower back and had been issued a cane to assist

3

with his left knee.  (Tr. 116) On July 1, 1988, Dr. Pollach noted
that Reed had no relief from his back pain, that an EMG taken in
April 1988 showed possible radiculopathy, and that a CT scan of
Reed's lumbar spine showed "slight facet point arthritis and
slight lateral stenosis at L3."  (Tr. 115) Dr. Pollach referred
Reed to a pain clinic for a neurosurgery consultation and ordered
treatment with a TENS pack.  (Tr. 115) Subsequent notes through
August 1989 repeat Dr. Pollach's findings and report Reed's
continued complaints of back and left knee pain with his left
knee occasionally giving out.  (Tr. 109-13)

On August 23, 1989, Dr. S.J. Yelich of the Pain Clinic
concluded that psychological factors were affecting Reed's
physical condition and referred him for outpatient psychiatric
treatment.  (Tr. 103-09) Psychiatric evaluations on September 8,
1989 and subsequent treatment notes through October 1989 diag-
nosed Reed with alcohol abuse and arthritis and stated that he
believed himself to be recovered from any drinking problem,
although the therapist was unable to "pin him down" about how
much he still drank.  (Tr. 100-08) On October 12, 1989, the
therapist noted that Reed's hands "exhibited fine trembling."
(Tr. 100) Additional notes from October 1989 state that Reed was
doing more around the house and playing pool and that he managed
his pain by moving around every 20 minutes or so.  (Tr. 99)

On August 28, 1990, ALJ Ver Wiebe determined that Reed was
disabled as of February 18, 1988.  (Tr. 29-33) In reaching this
decision, Ver Wiebe noted that Reed had three failed attempts to

4

return to work following his injuries in 1988.  (Tr. 29) He considered Reed's testimony regarding left leg pain, numbness, and swelling, and noted that Reed testified to the ability to walk one mile, stand for 30 minutes, and sit for 30-45 minutes at a time.  (Tr. 29) ALJ Ver Wiebe also reviewed medical records from Dr. Bruce Guberman, a Medical Assessment Form completed by Dr. Rex Hooker, a report by Dr. Randall Morgan, Jr., and records from the Northwest Indiana Spine Center.  ALJ Ver Wiebe also considered a Minnesota Multiphasic Personality Inventory ("MMPI") test completed by Dr. John Heroldt in which Dr. Heroldt diagnosed Reed with alcohol dependence and somatoform pain disorder.[1]  (Tr. 30-31) As a result of Dr. Heroldt's report, ALJ Ver Wiebe found that although Reed could work, Reed was totally disabled by reason of severe back pain, alcoholism, and somatoform disorder. (Tr. 32) In tandem with his decision, the ALJ completed a Psychiatric Review Technique ("PRT") reaching the same conclusions and stating that Reed had a moderate restriction in activities of daily living, slight difficulties in maintaining social functioning, frequent deficiencies in concentration, persistence, or pace, and repeated episodes of deterioration or decompensation. (Tr. 36) None of the evidence on which ALJ Ver Wiebe relied to reach his disability determination or complete his PRT, including Dr. Heroldt's MMPI results, appear in the administrative record.

---

[1] A somatoform disorder occurs when "[p]hysical symptoms . . . seem as if they are part of a general medical condition, however no general medical condition, or other mental disorder, or substance is present.  In this case psychological conflicts may [become] translated into physical problems or complaint."  PSYweb.com, at http://www.psyweb.com (Last visited May 25, 2005).

Reed's treatment notes from the VA hospital from 1991 to August 1994 indicate that Reed continued to complain of lower back pain, as well as left knee pain and weakness. (Tr. 87-96). An initial physical on July 20, 1993 indicated that Reed had mild lumbar tenderness with no spasming or tightness, but the notes from this time frame subsequently stated that diagnostic x-rays not contained in the record revealed lumbar scoliosis, and examinations revealed some trigger points and muscle spasms. (Tr. 87-96) A note from April 1994 stated that lumbosacral radiculopathy was possible, but inconsistent with a neurological exam, and that Reed was reluctant to have a spinal injection because of a trip to Las Vegas planned for May 1994, although he ultimately agreed to the injection. (Tr. 90)

On July 13, 1994, Reed completed a Report of Continuing Disability in which he stated that his left leg went numb "quite often" and that he had an "arthritic situation moving up into [his] arms." (Tr. 39) He described his ability to walk as "fair" and stated that he had occasional problems with leg and back pain, as well as a burning and tingling sensation down his left leg, that he occasionally needed help dressing and bathing, that his girlfriend did nearly everything around the house, and that he liked to shoot pool but could not do it very frequently. (Tr. 42-43) Disability Reviewer Cathy Sragg observed Reed to walk with a slight limp, stand slowly, and use the desk to assist him in standing up from a seated position. (Tr. 47) She noted that Reed came to the review with his one-year-old son who sat in Reed's

6

lap for most of the interview.  (Tr. 47) At one point, Reed's son
threw a pen on the floor, and Sragg observed Reed bend slowly to
pick it up.  (Tr. 47) She also observed him place his son on the
floor, although he appeared to have a slight problem picking him
up, and walk out with his son in his arms.  (Tr. 48)

On July 26, 1994, Reed completed an Activities of Daily
Living report in which he described his day as rising at 8:30 AM,
doing 30 minutes of home exercises prescribed by his therapist
followed by rest and medication to relieve the pain caused by the
exercises, babysitting for his one year old son, and playing pool
two or three times a week, which the doctor recommended to keep
Reed's back and legs moving.  (Tr. 49) He stated that during his
son's naps, he would either clean up around the house and play a
little pool or nap himself if his pain was bad.  (Tr. 49) He
further stated that although he could not play pool following his
accident now he was able to play.  However, he could not always
finish a pool game because of his pain, and he had altered his
stance and used a "cheaters stick" to avoid bending over the pool
table when he did play.  (Tr. 49) He stated that he had diffi-
culty mowing the lawn and frequently would ask a neighbor to
finish for him.  (Tr. 49) He described difficulty bending down,
which prevented him from getting the newspaper and made it
difficult for him to get dressed or out of the bathtub without
help, and mentioned instances in which his leg had given out.
(Tr. 49-51)

7

On August 1, 1994, Dr. Stana Michael completed a Mental Status Evaluation of Reed for the Disability Determination Bureau ("DDB").  (Tr. 119-21) In this examination, she stated that Reed denied problems with alcohol dependency and drugs, although he drank occasionally, and that he did not take his medications as frequently as prescribed.  (Tr. 119) Reed also described his day to Dr. Michael consistently with his Activities of Daily Living Report.  He stated that he helped his girlfriend do the cleaning but that she did the cooking and laundry.  (Tr. 120-21) Reed did not display memory or judgment/insight problems in the questions Dr. Michael asked, and he made only a few errors in calculating numbers.  (Tr. 120) However, he did not understand the adage "to strike while the iron was hot."  (Tr. 120) Based on her evalua-tion, Dr. Michael diagnosed Reed with "No Diagnosis" and stated that "[t]here were no data to support any kind of psychiatric disorder."  (Tr. 121)

On September 12, 1994, Dr. B.C. Guzman conducted a physical examination of Reed for the DDB during which Reed described his symptoms as low back pain and spasms, as well as left shoulder and arm numbness leading to hand cramps.  (Tr. 124-26) Dr. Guzman found that Reed had a grip strength of 4/5 on the right hand and 3/5 on the left and that Reed's right leg had a "sluggish knee jerk and ankle jerk." (Tr. 126) Dr. Guzman also noted that Reed had "ataxia with weak legs especially on the left side" and was unable to walk forward on his heels and toes, walk in tandem, hop, squat, or skip.  (Tr. 126) Finally, he noted tenderness in

Reed's lower cervical and lumbar spine and concluded that Reed had a herniated lumbar disc with arthritis of the cervical and lumbar spines.  (Tr. 127) In addition to Dr. Guzman's report, an MRI of Reed's lumbar spine taken August 30, 1994 revealed a "focal protrusion of the disc into the right lateral recess and right neural foramen at the level of L4-5."  (Tr. 122)

On September 26, 1994, the Commissioner determined that Reed no longer was disabled as of October 1, 1994.  (Tr. 76)  Reed sought reconsideration of his decision on October 4, 1994, stating that since the 1990 ALJ decision awarding benefits, he had begun to experience numbness in his left side in addition to his back problems.  (Tr. 54) He stated that walking was difficult at times, that he needed help getting in and out of the bath tub, that he could not straighten-up the house easily, and that he had cut down on shooting pool.  (Tr. 57) Disability Reviewer Sragg interviewed Reed for his reconsideration request and adopted all he previous observations from her first interview with him in July 1994.  (Tr. 60)

Two DDB reviewing doctors completed Psychiatric Review Techniques ("PRT") for Reed on September 26, 1994 and October 19, 1994, respectively.  In the September PRT, Dr. V. Maaess con-cluded that the evidence did not reveal a medically determin-able impairment.  (Tr. 78) In the October PRT, Dr. W. Shipley con-curred with Dr. Maaess' conclusion.  (Tr. 67) Dr. Shipley's only explanation for this concurrence was that Dr. Michael did not diagnose Reed with any psychiatric disorder.  (Tr. 68)

9

On October 20, 1994, Dr. A. Landwehr completed a Residual Functional Capacity Assessment ("RFC") for Reed in which Dr. Landwehr concluded that Reed could occasionally lift 20 pounds, frequently lift 10 pounds, stand, sit or walk for about six hours, and push or pull without any restrictions.  (Tr. 13)

On January 19, 1995, Disability Hearing Officer Mark Hudson conducted a disability hearing related to Reed's October 1994 request for reconsideration.  (Tr. 154-65) According to Hudson, Reed testified that his back pain and numbness had increased since 1990 and that he was undergoing his fifth nerve block at the end of the month.  (Tr. 155) He also stated that his leg frequently would give out on him.  (Tr. 155) Reed's mother and father testified consistently with Reed.  (Tr. 155) However, Hudson noted that the most recent evidence indicated that Reed was not in treatment for alcoholism and denied problems with alcohol, that his ADL were "not restrictive," and that he had a normal mental status evaluation.  (Tr. 156) Hudson accepted Reed's testimony that his ability to sit, stand, and walk fluc- tuated, but declined to believe Reed's statements that he could not use his fingers because all evidence indicated that Reed had a full range of motion and no difficulties using his hands.  (Tr. 156) Hudson determined that Reed had the RFC to lift and carry 10 pounds occasionally, less than 10 pounds frequently, and to walk and stand two hours out of an eight hour workday.  (Tr. 157) He further found that Reed's impairments had improved since 1990.

10

(Tr. 159) However, the Hearing Officer did not state what jobs
Reed now could perform.  (Tr. 163)

On March 6, 1995, Reed checked into a VA Hospital complain-
ing of lightheadedness, neck pain, and extreme sleepiness for
three or four days, as well as left leg pain and numbness.  (Tr.
209-11) He stated that three days earlier, he had experienced
amnesia when he became unaware of his surroundings while driving.
(Tr. 211) A physical evaluation by Dr. Hilip Hana revealed that
Reed was easily distracted, "extremely careful and very theatri-
cal."  (Tr. 211-12) However, Reed's strength was nearly 5/5 in
all extremities, and his exam and test results essentially were
normal except for the lumbar disc problems documented in past
evaluations.  (Tr. 211-12) In light of these inconsistent com-
plaints and findings, Dr. Hana stated that Reed demonstrated
astasia-abasia.[2]  (Tr. 212) On March 10, 1995, Reed was dis-
charged from the hospital with instructions to follow up with the
Neurology Clinic and Pain Clinic.  (Tr. 212) On March 24, 1995,
Reed's follow-up neurological examination showed that he had low
concentration and high distractability but that he performed
serial numbers and spelling tests accurately.  (Tr. 206)

On May 22, 1995, Reed again was brought to the VA hospital
by his pain clinic physician after he described suicidal
thoughts.  (Tr. 307) Reed told Dr. Peter Fore that he had been

---

[2] Astasia-Abasia is "[a] disorder whose predominant feature is a loss or
alteration in physical functioning that suggests a physical disorder but is
actually a direct expression of a psychological conflict or need."  Online
Medical Dictionary, at http://online-medical-dictionary.org (last visited May
25, 2005).

hospitalized for psychiatric problems in 1971 but claimed not to
have a memory of his hospitalization in March 1995.  (Tr. 307)
Dr. Fore initially diagnosed Reed with depressive disorder and
amnesia or a personality disorder with malingering.  (Tr. 307)
The record does not indicate when Reed was discharged.  (Tr. 307)

On March 9, 1995, Reed had an unremarkable CT scan of his
brain.  X-rays taken September 23, 1995 showed hypertrophic
degenerative changes to Reed's right and left hips, a small bony
spur on Reed's left femur, and calcification of a medical collat-
eral ligament in Reed's right femur.  (Tr. 304)

From May 1995 to September 1996, Reed received psychological
care from Social Worker Manuel Gonzalez and Clinical Psychologist
Terrell Loane.  (Tr. 167-204) Gonzalez reported that Reed's
girlfriend sent him a round-trip ticket to Alaska, where Reed
visited for three weeks in May 1995, although he reported having
a breakdown while there.  (Tr. 198, 204) Numerous notes from both
Gonzalez and Dr. Loane indicate that Reed exhibited concentration
and memory lapses, thought fragmentation, and confusion during
conversation throughout this time period, despite a generally
appropriate mood, ability to recount some past events, and
adequate communication skills.  (Tr. 178-80, 193, 198, 201-03)
Reed also reported hand tremors and continuing left leg, arm, and
back numbness and pain.  (Tr. 167, 183, 186, 190-91, 193, 195-96,
198, 203, 308, 314, 316, 319) In August 1995, Reed also began
complaining of inability to sleep.  (Tr. 188, 191-92) On Septem-
ber 1, 1995, Dr. D. Daniel examined Reed for complaints of

12

dizziness, weakness, and shaking hands, and concluded that Reed's symptoms were less likely organic and more likely functional. (Tr. 185-86) Reed also began to complain of slurred speech during episodes of left leg and spine numbness in 1995, which was observed by a nurse on August 22, 1996, and stuttered "theatrically" during appointments in April and June 1996 with Dr. Loane. (Tr. 173, 175, 182-83) However, a psychiatry note from March 26, 1996 indicates that neurology reports showed Reed to be "conscious, alert, oriented, with normal speech and normal cranial nerves, tones normal, strength in extremities normal, sensory-intact, gait normal." (Tr. 176) In addition, Dr. Loane noted that on August 8, 1996, Reed displayed difficulty sitting down and standing up, that he walked gingerly with a bad limp during his appointment, but that he appeared able to walk very well with a normal gait from a distance. (Tr. 170) Dr. Loane stated that malingering was a possibility. (Tr. 170) In November 1996, a pain clinic note mentioned malingering and stated that Reed exhibited "exaggerated pain behaviors when being observed." (Tr. 295) Around June 1996, Reed attended a pool tournament in Las Vegas, where he told Dr. Loane that he won $3,500. (Tr. 172)

Psychotherapy and medical notes through April 1997 report consistent complaints and medical findings. (Tr. 282-302) Reed joined group occupational therapy in March 1997. (Tr. 286) However, he continued to speak with slow and interrupted speech and to stutter occasionally in his appointments with Dr. Loane. (Tr. 290) He also continued to complain about pain in his lower

13

spine, left arm, and left leg, to ambulate with a cane, and to exhibit difficulty sitting and standing.  (Tr. 287-89) Nevertheless, an MRI taken February 5, 1997 showed degenerative disc disease throughout Reed's lumbar spine with a mild central disc bulge at L5/S1 and facet joint disease.  (Tr. 291) An April 24, 1997 EMG was normal except for low amplitudes in the left peroneal motor.  (Tr. 273)

Upon Reed's request, a hearing was held before ALJ Dennis Kramer on May 2, 1997.  (Tr. 544) At this hearing, Reed testified that when he initially was granted disability, his back and left leg were his greatest problems.  (Tr. 553) He described his continuing treatment for his pain in these areas, including multiple nerve blocks, MRIs, EMGs, and two TENS units.  (Tr. 553-54) He further stated that his left leg would go out when he did a lot of standing or walking.  (Tr. 555) His attorney noted that Reed was taking Amitriptyline, Buspiro, Trazodone, and Ibuprofen for his psychiatric and physical problems, although Reed denied having any psychological problems until 1995.  (Tr. 554-58) Reed stated that he attended group psychiatric therapy twice a week, cooked and did housework as he was able, and watched television during the day.  (Tr. 561-62) He testified that he did not sleep well, could walk four or five blocks on a good day or two blocks on a bad day, and could probably lift 10 pounds.  (Tr. 563) Reed stated that he used a cane most of the time, had difficulty bending and kneeling, sometimes had problems raising his arms

14

above his head, and could probably climb two flights of stairs if he took his time.  (Tr. 567-68)

Reed stated that he stopped playing pool approximately in 1992.  (Tr. 570) However, he later testified that in 1994 he tried to play pool two times a week.  (Tr. 571-72) At that time, he would play for 15 or 20 minutes at a time.  (Tr. 572) He initially could not remember visiting Las Vegas at any point, or winning $3,500 in a 1996 pool tournament there, but he subsequently stated that he had been to Vegas with a team to watch them play in a tournament.  (Tr. 559-60, 566, 569-70) He thought he won the money on the slot machines.  (Tr. 569) He also recalled attending family reunions in Ohio every year.  (Tr. 559-60)

Following Reed's testimony, clinical psychologist Joseph Cools summarized the evidence on file regarding Reed's mental status through the present date and concluded that as of "October 1994 there had been significant improvement" from 1990, when Reed initially was determined to be disabled.  (Tr. 573-76) On cross-examination, Dr. Cools stated that he could not say that Reed's previous diagnosis with somatoform disorder was erroneous and that it was possible that Reed still had such a disorder.  (Tr. 480-81) He further testified that sometimes somatoform disorders improve, but frequently they do not.  (Tr. 581) He also agreed that a claimant who continued to make the same complaints on which his original diagnosis of somatoform disorder was based generally would continue to have that disorder.  (Tr. 582) Dr.

15

Cools also testified that he did not know the origin of Reed's stutter, but that it did not appear to be physiologically based, although it could be psychologically-based.  (Tr. 584-85) He further agreed that a claimant with a personality disorder could exhibit Reed's previous behavior, including participating in a pool tournament and then denying it and appearing alternatively depressed and animated.  (Tr. 585-86) At the close of his testimony, Dr. Cools clarified that while Reed's 1990 diagnosis was affective disorder and somatoform disorder, he believed Reed had affective disorder, personality disorder, and substance addiction disorder at the time of the hearing.  (Tr. 586) However, Dr. Cools stated that his testimony regarding Reed's medical improvement was <u>not</u> based on Reed's personality disorder, but on his affective disorder: the thrust of his testimony was that Reed no longer was as depressed as he was in 1990.  (Tr. 587)

Next, orthopedic surgeon William Newman testified that Reed's spinal MRIs showed consistent problems at L5 and that he had minor degeneration at S10 and spur around both hips.  (Tr. 591) Dr. Newman also noted that the 1988 EMG on record showed irritability on both sides of the S1/S2 muscles and paraspinal muscles, but that all signs of irritability were gone in a 1989 EMG, although subsequent EMGs showed irritability in Reed's left arm and leg, as well as all of his muscles except one aspect of Reed's left hand.  (Tr. 591) Dr. Newman stated that Reed's medications were mostly psychotropic and that he was unfamiliar with them.  (Tr. 595) Dr. Newman stated that Reed did not meet

16

any Listings for physical impairment but that Reed's L5 disc
problems and degenerative changes likely could be a source of
back pain.  (Tr. 592) He stated that in October 1994, Reed had an
RFC to lift 20 pounds occasionally, lift 10 pounds frequently,
and to stand or walk for a total of six hours a day.  (Tr. 593)
He found that Reed did not need a cane and that no evidence in
the record indicated that a cane had been prescribed.  (Tr. 593)

On cross-examination, Dr. Newman stated that his RFC was
based on orthopedic findings rather than the psychological
records and that Reed's inconsistent testimony as to his abili-
ties could be due to functional overlay or a conversion disorder.
(Tr. 597) He also testified that the ibuprofen prescribed for
Reed's pain would be medication appropriate for real pain, rather
than imaginary pain.  (Tr. 598) After Dr. Newman's testimony, Dr.
Cools stated that functional overlay can fall within the listing
for either somatoform disorders or personality disorders but that
its proper categorization was a matter of degree and opinion.
(Tr. 600)

Last, VE Cheryl Hoseith testified that if Reed had the RFC
for light, unskilled work, he could perform 16,000 assembly jobs,
25,000 jobs as a cashier, 8,000 handpacking jobs, 4,400 jobs as a
janitor, and 5,000 kitchen assistance jobs.[3]  (Tr. 602) In re-
sponse to a hypothetical posed by Reed's attorney, for a claimant
who could walk 4-5 blocks, stand or sit for 10 to 50 minutes,

---

[3] The "B32" mental RFC and "B33" physical RFC on which ALJ Kramer relied
throughout this hearing are either mislabeled or not present in the record.
B32 and B33 are medical records, rather than RFCs.

17

frequently lift four pounds and occasionally lift eight to nine
pounds, used a cane to walk and stand, could climb two flights of
stairs slowly, occasionally kneel, and could not climb ladders,
VE Hoseith testified that this person could perform 3,000 hand-
packing jobs, 4,000 cashier jobs, and 6,000 assembly jobs.  (Tr.
603-09)

In determining that Reed no longer was disabled as of Octo-
ber 1, 1994, ALJ Kramer considered the testimony of Dr. Newman,
including his statements that there was no objective basis for
Reed's use of a cane and that medical reports from the VA and
Pain Clinic suggested that Reed was malingering.  (Tr. 219) He
also reviewed Dr. Cools' testimony that Reed had a disturbance of
mood and pathological dependence but that his impairments were
not severe enough to meet a listing.  (Tr. 219) Based on the
testimony of these physicians, ALJ Kramer concluded that Reed had
improved since 1990.  (Tr. 220) Consistent with Dr. Cools, the
ALJ found that Reed had an affective disorder, personality
disorder, and substance addiction disorder, but that these
impairments were not severe to meet any Listings.  (Tr. 225-28)
The ALJ also discounted Reed's testimony as inconsistent with the
objective medical evidence and Reed's ADL because Reed took care
of his personal needs, visited his two year old child, cooked,
cleaned, and played pool twice a week.  (Tr. 221) Thus, ALJ
Kramer found that Reed had an RFC to perform the jobs Hoseith
initially described for a claimant with no mental impairments.
(Tr. 222, 602)

18

Following Reed's request for review, the Appeals Council reversed ALJ Kramer's decision and remanded Reed's case on November 12, 1999 because the ALJ failed to provide an "adequate rationale in support of the conclusion that medical improvement [had] occurred." (Tr. 229, 340-42) Specifically, the Appeals Council found that ALJ Kramer failed to provide a comparison of the prior and current medical evidence, as required to establish medical improvement. (Tr. 340) In addition, the Council stated that the ALJ needed to provide a further evaluation of Reed's mental impairments and provide an adequately supported PRT, remove evidence from the record pertaining to a third party, expand the record to clarify Reed's occupational base, and clarify whether alcoholism remained a contributing factor in Reed's disability. (Tr. 341)

On September 24, 1997, Dr. Robert Coyle administered an MMPI and Rorschach Test to Reed, rated him on the Vineland Social Maturity Scale, and conducted a clinical interview of Reed. (Tr. 402) Dr. Coyle's interview with Reed gave the impression that Reed was a "poor historian" with poor memory. (Tr. 402) He observed Reed to be cooperative but confused, with a stiff and unsteady gait, and tremorous hands. (Tr. 404) Reed responded to questions relevantly and understandably, although in a delayed manner. (Tr. 404) Reed's performance on the MMPI indicated a large number of deviant responses, as well as a disposition to abuse psychoactive substances. (Tr. 405) The test also revealed that Reed's somatoform disorder was much worse than when Reed was

19

administered the MMPI for his 1990 disability determination and
that Reed now also was "disorganized and possibly out of contact
with reality." (Tr. 405) Dr. Coyle found Reed's Vineland results
to be "consistent with that of an often confused and miserable
individual." (Tr. 405) In the context of this test, Reed re-
peated his complaints regarding pain and numbness on the left
side of his body, stated that he did his own laundry, could
drive, and enjoyed playing pool, although he had to rest after 20
or 30 minutes of playing. (Tr. 406)

In addition, Dr. Coyle found that the results of the Ror-
schach test were consistent with a somatoform disorder in that
Reed was "morbidly fixating his attention on his spine," had
little interest in social interaction, and was easily overwhelmed
and emotional inconsistent. (Tr. 406) Finally, Dr. Coyle found
that Reed had "more of a complex psychological problem, that it
is a simple somatoform disorder." (Tr. 406) He critiqued Dr.
Michael's evaluation noting that she did not diagnose malingering
but rather made a diagnosis of "no diagnosis" based on a brief
mental evaluation that was not completely normal. (Tr. 406) He
further stated that the SSA had failed to consider Reed's pro-
gressively worsening somatoform disorder before terminating
Reed's benefits. (Tr. 406) Dr. Coyle concluded that Reed had
Somatoform disorders - subsection Conversion Disorder, but
without any Organic Mental Disorder, as well as chronic back
pain. (Tr. 407)

20

Treatment notes from 1997 through 2000 echo the complaints and findings of Reed's previous medical records. (Tr. 230-69, 442-500) Reed reported pain, numbness, and burning in his back and the left side of his body, a weak left leg, depression, difficulty thinking and remembering, and sleepiness. (Tr. 235, 237, 242, 244-45, 251, 255-57, 260, 264-67, 281, 442) He frequently was reported to have an unsteady, slow gait, to walk with a cane, to stutter occasionally, and to speak in a slow and interrupted manner. (Tr. 243, 253, 259, 262, 266, 499) Several treatment notes indicate that he appeared restless or irritable. (Tr. 261, 263, 281, 458, 493-94) Reed also continued to have epidural nerve blocks, although an EMG taken May 10, 2000 did not reveal any left lumbar radiculopathy. (Tr. 261, 443) In addition to these physical tests, Dr. Loane appears to have administered an MMPI to Reed in December 1997, although the record does not contain the results of this test. (Tr. 488)

On February 18, 2000, ALJ William Wilkin conducted the hearing ordered by the Appeals Council in 1999. (Tr. 616-89)  In this hearing, Reed testified that he never was an alcoholic but that Inland Steel required him to attend an alcohol treatment program "in order to go to pain management." (Tr. 635) He stated that in 1994 he was having problems with his back, left knee, and memory, which was worse at the time of the hearing, and that he was treating his back with epidurals and attending counseling. (Tr. 636-43, 670) He also stated that his medications made him sleepy, that he needed to take them in order to sleep, but that

he refrained from taking them the morning of the hearing so that
his head was clear.  (Tr. 640-41, 646, 685) Reed estimated that
in 1994 he would nap for one and one-half or two hours a day,
though he was resting for twice that amount in 2000.  (Tr. 668)
In discussing his three-week trip to Alaska in 1995, Reed testi-
fied that the visit largely consisted of sitting, although he
went out to dinner twice.  (Tr. 642) At the time of the hearing,
Reed testified that he could clean the house and cook for him-
self, although it took him awhile to complete these tasks, and
that he took showers because he no longer could get into the
bathtub.  (Tr. 646, 658) He could walk half a mile, stand for 20
minutes, sit for longer than 30 minutes, and play pool occasion-
ally for no more than an hour, but he could not bend or stoop
well, or comfortably lift a gallon of milk.  (Tr. 648, 651, 655-
56, 664) ALJ Wilkin observed that Reed's speech was hesitant and
that his hands trembled slightly, and Reed testified that he
sometimes dropped things and frequently spilled his coffee.  (Tr.
654, 657)

    Following Reed's testimony, ALJ Wilkin posed several hypo-
theticals to VE Irvin Roth.  (Tr. 676-81) In the first hypotheti-
cal, for a light work function without extensive walking or
standing, VE Roth testified that light work would require the
claimant to be on his feet for six hours out of an eight hour
day, which would be considered "extensive."  (Tr. 676) However,
Roth testified that a claimant who could perform light jobs with
a sit/stand option would be able to perform 4,000 jobs as a

cashier, 2,000 packing jobs, and 1,500 jobs as an inspector.
(Tr. 677) For a second hypothetical for sedentary work with the
same restrictions, Roth stated that this claimant could perform
all of the previous jobs.  (Tr. 677) In response to a third
hypothetical for sedentary work with a mental restriction to
simple one-two step operations, Roth testified that this claimant
could perform the handpacking and inspector jobs, as well as
about 2,500 or 3,000 assembly jobs.  (Tr. 678) Fourth, Roth
testified that a claimant who was limited in his ability to
concentrate, in addition to the restrictions set forth in hypo-
thetical three, could perform the handpacking and assembly jobs.
Finally, Roth stated that a claimant who could not sustain eight
hours of employment would be precluded from full-time work.  (Tr.
579)

On June 26, 2000, ALJ Wilkin held a second hearing to
clarify issues raised in his February hearing.  (Tr. 691-716) At
this time, Reed no longer was represented by counsel.  (Tr. 691)
In this hearing, the ALJ noted that the independent records had
shown that Reed did not win any money in a pool tournament in Las
Vegas, which Reed confirmed.  (Tr. 693) Reed stated that he never
won $3,000 in a pool tournament.  (Tr. 693) He testified that he
continued to see VA physicians monthly, and at times weekly, and
that he was still receiving injections for pain relief.  (Tr.
696) He also testified to a general deterioration of his condi-
tion since the previous hearing.  (Tr. 698)

23

Reed's fiancee, Loretta Ficker, also testified that Reed's problems progressively had gotten worse in the five and one-half years she had known him. (Tr. 702-03) She stated that she had seen Reed's leg give out causing him to fall and that he had gotten stuck in the bathtub. (Tr. 702) She also testified that Reed got regular injections to manage his pain and that he was using a cane almost constantly, although he had used it only sporadically when they first met. (Tr. 704, 707) Ficker testi- fied that Reed would do a little work around the house and then lay down or sit down and that she had to monitor his medications because they made him sleepy. (Tr. 705)

In finding "significant medical improvement" in Reed's condition between 1990 and 1994, ALJ Wilkin considered Reed's testimony that his back and knee pain were progressively worsen- ing, he needed a cane, his knee gave out, his hands trembled so that he could not grasp or use them, he could stand 20 minutes, sit 30-60 minutes, walk half a mile, and lift half a gallon, but that he could drive, maintain his home, go places independently, and had friends. (Tr. 19) The ALJ concluded that Reed was not fully credible because his complaints were excessive in light of the medical record; the physician notes from 1995 and 1996 which stated that Reed was "extremely careful and very theatrical," may be faking or malingering, exhibited "exaggerated pain behavior," and limped only when observed; and a 2000 EMG which did not show radiculopathy even as Reed used a cane. (Tr. 19-21) Furthermore, ALJ Wilkin rejected Reed's allegations of hand numbness and

tremors because these symptoms were not supported by the medical evidence, his grip strength was 5/5 in the right and 4/5 in the left, and Reed continued to participate in pool competitions. (Tr. 20) ALJ Wilkin further found Reed's ADL inconsistent with his "alleged degree of functional impairment" because despite Reed's testimony regarding pain, he drove 15 miles to the hearing and testified he could walk half a mile.  (Tr. 20) He concluded that VA records from 1996 showed that Reed made "blatantly false and deliberate allegations" that he experienced post-traumatic stress disorder and residuals of shell fragment wounds, although the VA found no evidence that Reed served in a combat zone or received combat decorations.  (Tr. 534) Therefore, the ALJ concluded that Reed could "stand and walk six of eight hours, lift 20 pounds occasionally and ten pounds frequently, and perform a full range of postural activities."  (Tr. 21)

With respect to Reed's mental status, ALJ Wilkin found that Reed did not have a severe mental impairment that limited his functional capacity.  (Tr. 21) In reaching this conclusion, the ALJ relied upon Dr. Michael's August 1, 1994 examination in which Dr. Michael rendered a diagnosis of "no diagnosis."  (Tr. 21) He noted that Reed appeared cooperative and appropriate and that the exam showed "no signs of thought disorder."  (Tr. 21) The ALJ further criticized Reed's testimony as inconsistent because Reed told Dr. Michael that his girlfriend assisted with cleaning and shopping and performed all cooking and laundry, yet later testi-fied that he could cook and clean for himself.  (Tr. 21) ALJ

25

Wilkin also stated that the VA records showed only one psychiatric hospitalization and one alcohol treatment program attendance, both of which occurred during Reed's military service.  (Tr. 21) In addition, he concluded that Reed's active pool playing, including participation in competitions, as well as his gambling, showed that his mental impairment was not severe.  (Tr. 21) Thus, ALJ Wilkin concluded that Reed could perform the light jobs requiring a sit/stand option that VE Roth enumerated in response to the ALJ's first hypothetical.  (Tr. 22)

<u>Discussion</u>

The standard for judicial review of an ALJís finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. ß405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive.");  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852, (1972)(*quoting* *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also* *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJís decision must be affirmed if the findings are supported by

substantial evidence and if there have been no errors of law.
*Rice v. Barnhart*, 384 F.3d 363, 368-369 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

The Social Security regulations enumerate a five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability.  20 C.F.R. ß404.1520.  However, once a Social Security claimant is found to be disabled, the agency "must evaluate the claimant's impairments 'from time to time to determine if [the claimant is] still eligible for disability benefits.'" *Johnson*, 191 F.3d at 774 (*quoting* 20 C.F.R. ß404.1589)(alteration in original).  *See also **Jackson v. Massanari***, No. IP00-1569-C-H/G, 2001 WL 1175094, at *2-3 (S.D. Ind. Aug. 14, 2001).  This review proceeds in a distinct eight-step inquiry: (1) Is the claimant engaging in substantial gainful activity? (2) If not, does the claimant have an impairment or combination of impairments which meets or equals the severity of a listed impairment? (3) If not, has the claimant experienced "medical improvement as shown by a decrease in medical severity"?  If medical improvement exists, (4) is it related to the claimant's ability to work?  If no medical im-provement exists <u>or</u> the medical improvement is not related to the claimant's ability to work, (5) do any of the exceptions set forth in the relevant regulation apply?  (6) If the medical improvement impacts the claimant's ability to work or if certain

exceptions apply, does the claimant's current impairments in combination remain severe? (7) If the impairment(s) is severe, can the claimant nonetheless engage in his previous work? (8) If the claimant cannot engage in his previous work, does he retain the RFC to do other work? *See* 42 U.S.C. ß423(f); 20 C.F.R. ß404.1594(f). *See also **Jones v. Shalala**,* 10 F.3d 522, 524-26 (7th Cir. 1993); ***Jones v. Barnhart***, No. 04 C 3532, 2005 WL 66072, at *8 (N.D. Ill. Jan. 10, 2005); ***Lewis v. Barnhart***, 201 F.Supp.2d 918, 931 (N.D. Ind. 2002). The claimant will be found not disabled if the answer is affirmative at steps one, five, seven, or eight, or if the answer is negative at step six. *See* 20 C.F.R. ß404.1594(f).

Reed's first argument in support of reversal is that ALJ Wilkin could not find medical improvement when the record Wilkin reviewed did not contain the exhibits on which ALJ Ver Wiebe relied to find that Reed was disabled. (Pl. Brief Supp. MSJ, p. 17) Because the court agrees with Reed, this case must be remanded.

The SSA regulations define "medical improvement" as "any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled." 20 C.F.R. ß404.1594(b)(1) This determination requires a comparative analysis of the "symptoms, signs and/or laboratory findings associated with [the claimant's] impairment(s)." *See* 20 C.F.R. ßß404.1594(b)(1); 404.1594(b)(7).

28

*See also* 42 U.S.C. ß423(f); ***Veino v. Barnhart***, 312 F.3d 578, 586-87 (2nd Cir. 2002); ***Rice v. Chater***, 86 F.3d 1, 2 (1st Cir. 1996); ***DeLeon v. Secretary of Health and Human Services***, 734 F.2d 930, 936-37 (2nd Cir. 1984); ***Mason v. Shalala***, 994 F.2d 1058, 1064 n.10 (3rd Cir. 1993); ***Duranty v. Sullivan***, No. 91-2900, 1992 WL 58956, at *2-3 (7th Cir. 1992).   If the record does not include the evidence on which the original disability finding was based, this comparison cannot be made.  *See* ***Veino***, 312 F.3d at 587. Moreover, without this evidence, "the administrative record lacks a foundation for a reasoned assessment of whether there is substantial evidence to support the Commissioner's finding" of medical improvement.  ***Veino***, 312 F.3d at 587.  *See also* ***Charlebois v. Commissioner, Social Security Administration***, No. 02-CV-686 LEK/GJD, 2003 WL 22161591, at *11 (N.D.N.Y. Sept. 12, 2003). Thus, when the prior record cannot be located and "relevant parts of the prior record are not reconstructed either because it is determined not to attempt reconstruction or because such efforts fail, <u>medical improvement cannot be found</u>."  20 C.F.R. ß404.1594(c)(3)(v) (emphasis added).

A determination of medical improvement also must be based upon the appropriate time period.  *See* AR 92-2(6), 1992 WL 425419, at *2; ***Johnson***, 191 F.3d at 773-76.  42 U.S.C. ß423(f) states that a cessation decision must be based on "all evidence available in the individual's case file, including new evidence concerning the individual's prior or current condition. . . ." The Commissioner interprets the term "current" to "relate to the

time of the cessation under consideration in the initial determi-
nation of cessation." *See* AR 92-2(6), at *2.  In other words,
the ALJ must compare the evidence on which the most recent
positive decision was based with the evidence on which the
initial cessation of benefits decision was reached.  *See **Johnson***,
191 F.3d at 773-76.  Therefore, Acquiesence Ruling 92-2(6) and
Seventh Circuit law required ALJs Kramer and Wilkin to compare
pre-1990 evidence with evidence from 1990-94 before reaching
their decisions that Reed had medically improved.

Reed has sought to have his disability benefits reinstated
for over 10 years.  Despite this length of time, the SSA twice
has failed to provide the most fundamental ingredient of the
cessation review: a complete record.  *See* 42 U.S.C. ß423(f); 20
C.F.R. ß404.1594; ***Venio***, 312 F.3d at 586-87.  Although the
Appeals Council reversed and remanded ALJ Kramer's decision
finding medical improvement in part because he filed to provide
the requisite comparison of prior and current evidence, ALJ
Wilkin merely repeated this error by reaching a decision on a
record nearly devoid of pre-1990 evidence.  As a result, ALJ
Wilkin primarily considered physicians' notes from 1995 and 1996
with no comparison to records pre-dating ALJ Ver Wiebe's 1990
decision finding Reed disabled.  More problematic still, ALJ
Wilkin's decision considered Reed's complaints as of 2000, rather
than 1994, and did not even discuss any of Reed's symptoms prior
to 1994.  (Tr. 19) Because of the incomplete record and the ALJs'
resulting analytical errors, this case must be remanded.

30

The Commissioner's argument that the record contains ade-
quate information regarding Reed's pre-1990 condition is not
well-taken.  (Response Brief, p. 18 n.7) The Commissioner sug-
gests that ALJ Ver Wiebe's 1990 decision is an adequate basis for
comparison with Reed's status in 1994 because the decision
summarizes ALJ Ver Wiebe's findings on Reed's impairments and
discusses a PRT.  The Second Circuit expressly rejected this
argument in *Veino*:

> The difficulty with the Commissioner's posi-
> tion is that [the ALJ's decision is] not
> evidence.  The ALJ did not cite or include in
> the record the [earlier] medical evidence
> itself . . .; and without any of the [ear-
> lier] medical evidence in the record before
> us, this Court cannot make a reasoned deter-
> mination as to whether the [hearing offi-
> cer's] summary is accurate or adequate.
>
> 312 F.3d at 587

This court adopts the Second Circuit's reasoning.  The previous
favorable decision of an ALJ cannot be construed as a symptom,
sign, or laboratory finding, which are the only relevant criteria
for a cessation decision under the SSA's regulations.  *See* 20
C.F.R. ßß404.1594(b)(1); 404.1594(b)(7).  Furthermore, the
section of the SSA regulations addressing lost administrative
records does not state that an ALJ's decision is an appropriate
substitute.  *See* 20 C.F.R. ß404.1594(c)(3)(v).  For these rea-
sons, the Commissioner's argument fails.

Having already determined that remand is necessary, this
court need not reach any of Reed's other arguments.  However,
Reed's absent administrative record finally may be found on

31

remand.  Therefore, in the interest of judicial economy and
because Reed has been without benefits for approximately 10
years, this court will reach one more objection Reed raises to
the ALJ's decision: the ALJ Wilkin erroneously failed to consider
Dr. Coyle's September 24, 1997 psychological evaluation.

Without citation to authority, the Commissioner argues that
ALJ WIlkin was not required to consider Dr. Coyle's psychological
evaluation of Reed merely because Dr. Coyle examined and tested
Reed three years after the relevant time period.  According to
the Seventh Circuit, an ALJ is "required to consider recent
evidence regarding [Reed's] condition during [his] insured period
of time, but [is] entitled to give dominant weight to the contem-
poraneous records." **Mack v. Shalala**, No. 92-3922, 1993 WL
483309, at *1 (7th Cir. Nov. 22, 1993)(citations omitted).  *See
also* **Estok v. Apfel**, 152 F.3d 636, 640 (7th Cir. 1998).  Although
Dr. Coyle's examination fell after 1994, Dr. Coyle considered the
results of his testing to be consistent with Reed's 1990 diagno-
sis of somatoform disorder, compared Reed's performance on a pre-
1990 MMPI, critiqued Dr. Michael's 1994 evaluation of Reed, and
noted that the SSA had failed to consider that Reed's disorder
was progressively worsening before withdrawing his benefits.
(Tr. 406) Given Dr. Coyle's specific references to the relevant
time period, the comprehensive nature of his testing, and his
criticism of the primary medical evaluation on which ALJ Wilkin
relied to find that Reed had medically improved, the ALJ may not
simply ignore Dr. Coyle's observations - especially when the ALJ

predominantly drew from other evidence post-dating 1994 to reach
his decision denying benefits. *See* **Zurawski v. Halter**, 245 F.3d
881, 888 (7th Cir. 2001) (*quoting* **Bauzo v. Bowen**, 803 F.2d 917,
923 (7th Cir. 1986) (emphasis in original) ("Both the evidence
favoring the claimant as well as the evidence favoring the
claim's rejection must be <u>examined</u>, since review of the substan-
tiality of evidence takes into account whatever in the record
fairly detracts from its weight.").  Likewise, the ALJ may not
ignore other evidence fairly attributed to the relevant period,
such as Reed's ongoing receipt of epidural injections, medica-
tions, and psychiatric therapy. *See* **Herron v. Shalala**, 19 F.3d
329, 333-34 (7th Cir. 1994) (stating that the ALJ may not ignore
an entire line of evidence).

Though not reached here, the Commissioner should consider
the other arguments raised by Reed in his appeal to this court in
the event that the missing administrative record is found and a
third disability decision is made.  In particular, the Commis-
sioner should consider Reed's impairments in light of the Seventh
Circuit's recent decision addressing somatoform disorder, **Carra-
dine v. Barnhart**, 360 F.3d 751 (7th Cir. 2004).

Moreover, the SSA must retroactively reinstate any of Reed's
unpaid benefits to December 31, 1994 until a proper decision can
be made pursuant to 20 C.F.R. ß404.1594(c)(3)(v).[4]  *See* C.F.R.

---

[4] The parties indicate that Reed was determined to have medically
improved as of October 1, 1994, but that his benefits terminated December 31,
1994 pursuant to 20 C.F.R. ß404.316(b)(3).  Although the parties indicate that
his benefits continued after 1994 for some period pending the outcome of his
first appeal, neither party provides a date certain for their termination or

ß404.1597a(i)(6) (stating that if the court remands a case for further proceedings, the ALJ's decision on medical cessation no longer is in effect and continued benefits are payable to the claimant pending a new decision by the ALJ or final action by the Appeals Council).  *See also* **Hayden v. Barnhart**, 374 F.3d 986, 994 (10th Cir. 2004); **Lewis**, 201 F.Supp.2d at 939.  Given the length of time Reed already has waited for a correct determination of benefits, this decision should be made with "all deliberate speed."  **Lewis**, 201 F.Supp.2d at 939.

_____

For the foregoing reasons, the Motion for Summary Judgment filed by the plaintiff, Jimmy Reed, on October 12, 2004 is **GRANTED**.  This case is **REMANDED** for proceedings consistent with this Opinion.  The plaintiff's unpaid disability benefits are **ORDERED REINSTATED** retroactive to December 31, 1994, pending a new decision by the Social Security Administration pursuant to 20 C.F.R. ßß404.1594(c)(3)(v) and 404.1597a(i)(6)

ENTERED this 12th day of July, 2005

s/ ANDREW P. RODOVICH
United States Magistrate Judge

---

any indication of whether Reed paid back some of those benefits pursuant to 20 C.F.R. ß404.1597a.  Because the parties are not clear on this point, the court cannot be more specific than to require reinstatement of "any of Reed's unpaid benefits to December 31, 1994."